IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| HIDALGO COUNTY DRAINAGE | § | |
| DISTRICT NO. 1 | § | |
| | § | |
| V. | § | NO. 7:18-CV-369 |
| | § | JURY DEMANDED |
| TEDSI INFRASTRUCTURE | § | |
| GROUP, INC.; DOS LOGISTICS, | § | |
| INC.; DANNENBAUM | § | |
| ENGINEERING COMPANY – | § | |
| MCALLEN, LLC; DANNENBAUM | § | |
| ENGINEERING CORPORATION; | § | |
| INTEG CORPORATION; | § | |
| GODFREY GARZA, JR.; VALLEY | § | |
| DATA COLLECTION | § | |
| SPECIALISTS, INC.; ANNIE Q. | § | |
| GARZA; GODFREY GARZA, III; | § | |
| AND JONATHAN GARZA | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

## I.     Parties & jurisdiction

1.      Plaintiff Hidalgo County Drainage District No. 1 is a governmental entity located in Hidalgo County, Texas.

2.      Defendant TEDSI Infrastructure Group, Inc. is a Texas corporation doing business in Hidalgo County.  It may be served through its registered agent: John H. Rehm, 2121 Sage Rd., Suite 100, Houston, TX 77056.

3.      Defendant Dos Logistics, Inc. is a Texas corporation doing business in Hidalgo County.  It may be served through its registered agent: Eric Camarillo Chin, 2904 E Mile 9 1/2 , Donna, TX 78537.

4.      Defendant Dannenbaum Engineering Company - McAllen is a Texas company doing business in Hidalgo County. It may be served through its registered agent: James D. Dannenbaum, 3100 W. Alabama, Houston, Texas 77098.

5.      Defendant Dannenbaum Engineering Corporation is a Texas corporation doing business in Hidalgo County. It may be served through its registered agent: James D. Dannenbaum, 3100 W. Alabama, Houston, Texas 77098.

6.      Defendant Integ Corporation is a Texas corporation with its principal office in Hidalgo County, Texas. It may be served through its registered agent, Godfrey Garza, Jr., at 4209 Mile 8 Road, Edinburg, Texas 785410

7.      Defendant Valley Data Collection Specialists, Inc. is a Texas corporation with its principal office in Hidalgo County, Texas. It may be served through its registered agent, Annie Q. Garza, at 4209 Mile 8 Road, Edinburg, Texas 78541.

8.      Defendants Godfrey Garza, Jr.. and Annie Q. Garza are individuals residing in Hidalgo County, Texas. They may be served at their residence, 4209 Mile 8 Road, Edinburg, Texas 78541.

9.      Godfrey Garza, III is an individual residing in Collin County, Texas. He may be served at his residence, 6000 El Dorado Pkwy., Apt. 1527, Frisco, Texas 75033.

10. Jonathan Garza is an individual residing in Hidalgo County, Texas. He may be served at his residence, 900 W. Daffodil Avenue, Pharr, Texas 78577-4451.

11. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that this action arises under federal law, and under 28.U.S.C. § 1367(a) over Plaintiff's supplemental state law claims.

## II.  Venue

12. Venue is proper under 28 U.S.C.A. § 1391(b)(1) in that at least one Defendant resides in this District and all Defendants reside in Texas.

## III.  Facts

### A.  About Hidalgo County

13. The United States Government defines Hidalgo County as "persistently poor."[1] A county is "persistently poor" if 20 percent or more of its population lived in poverty over the last thirty years (measured by the 1980, 1990, and 2000 decennial censuses and 2007-11 American Community Survey 5-year estimates).[2] Most counties are not poor. Only 11.2 percent of all counties nationwide meet the definition.[3]

---

[1] *See* USDA Economic Research Service, *ERS County Typology Codes, 2015 Edition,*
https://www.ers.usda.gov/topics/rural-economy-population/rural-poverty-well-being/geography- of-poverty/.

[2] USDA Economic Research Service, *Geography of Poverty, Rural Poverty & Well Being,*
https://www.ers.usda.gov/topics/rural-economy-population/rural-poverty-well-being/geography- of-poverty/.

[3] *Id.*

14.     Because it is poor, Hidalgo County struggles to meet its citizens' basic needs.[4]
Adding to its infrastructure demands, Hidalgo County's population more than doubled from
383,545 in 1990[5] to 774,769 in 2010.[6] The Government estimates Hidalgo County's 2016
population at 828,334.[7]

### B.     Hidalgo County addresses flooding

15.     Tropical events and severe storms cause frequent street, home, and agricultural
flooding in a already distressed community.[8] Made in response to Hurricane Beulah, a 1969
study by what is now known as the Natural Resource Conservation Service ("NRCS")
proposed a three phase plan to create a Master Drainage System ("MDS") in Hidalgo County.

16.     Plaintiff Hidalgo County Drainage District No. 1 ("HCDD1" or "the District")
wanted to implement the NRCS drainage plan. But without federal dollars, it could not afford
to fully fund Phase I of the project.[9] It therefore commissioned in1974 an interim plan to

---

[4] *See, e.g.,*, Chris McGreal, *America's Poorest Border Town: No Immigration Papers, No American Dream*, The Guardian, November 19, 2015, https://www.theguardian.com/us-news/2015/nov/19/americas-poorest-border-town-no-immigrati on-papers-no-american-dream.

[5] United States Bureau, *1990 Census: Population of Texas Counties, Census of Population and Housing*, available at https://www.tsl.texas.gov/ref/abouttx/popcnty1.html.

[6] United States Census Bureau, *2010 Census, Community Facts*, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk.

[7] United States Census Bureau, *2012-2016 American Community Survey 5-Year Estimates*, Community Facts, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR_B01003&prodTyp e=table.

[8] *See* Turner, Collie, & Braden, Inc., *Engineering Report to Hidalgo County Drainage District No. 1*, Flood Protection Plan for Hidalgo County, Texas, September 1997, *available at*: http://www.twdb.texas.gov/publications/reports/contracted_reports/doc/97483216.pdf.

[9] *See* Hidalgo County Drainage District No. 1, *History of Hidalgo County Drainage District No. 1*, About the District, http://hcdd1.org/page/History_of_District.

address the County's flooding problems.[10] Voters approved a $26 million bond issuance in 1975.[11] Construction of MDS Phase I started in 1981 and was eventually finished with local money only.[12]

17.     Looking to Phase II, State and local stakeholders commissioned more studies of the MDS in the and '90s.[13] Those studies culminated in the 1997 Collie and Braden report.[14] The study zeroed in on two major problems: the MDS's capacity and the lack of adequate lateral drainage to access the system.[15]

18.     The District completed its debt for bond service on the Phase I '75 issue in 2001. With about four million dollars left from the issue and another five million dollars from the County, the District started looking at how to execute Phase II of the MDS.

C.     **Godfrey Garza, Jr. becomes manager of the District**

19.     Plaintiff hired Garza, Jr. in or around 1996 as the District's Manager. In hiring Garza, Jr., the District trusted him to always act in the District's best interest.

20.     In October of 2000, Garza, Jr. made a curious pitch to the Drainage District: that he resign as manager and that Plaintiff hire his company, Integ, in his place. It was not in the District's best interest to have a supposed "independent contractor" as opposed to an

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *See* Turner, Collie, & Braden, Inc., *Engineering Report to Hidalgo County Drainage District No. 1.*

[14] *Id.*

[15] *Id.*

employee of the District. At least not when the "independent" contractor was not itself going to hire personnel, invest in a business, or risk its own losses in managing the district.

21.     Godfrey Garza, Jr.'s guaranteed compensation continued to rise:

| Year | Compensation[16] |
|------|------------------|
| 2002 | $97,200 |
| 2004 | $121,200 |
| 2006 | $123,192 |
| 2007 | $123,192 plus 1.5% of actual construction costs of MDS Phase II |

22.     Not satisfied with a handsome salary, Godfrey Garza, Jr. made another dubious pitch in or around February of 2007. He told the board he wanted to manage construction of MDS Phase II in return for 1.5% of actual project construction costs. *See* Ex. A; FF. Garza, Jr. hoodwinked the board by having a TEDSI representative (Mark Lupher) tell the board Garza, Jr.'s construction management fee was a "good deal" for the District. *Id.* This was not a "good deal" for the District, and TEDSI knew or should have known it was not a good deal: Garza, Jr. was already contractually obligated to manage the District's affairs; the contracts eventually entered into for Phase II called for others to perform construction management; Garza, Jr. would have had to have been a licensed engineer to do the work.

---

[16] These amounts only reflect amounts the District paid for management of the District. Garza / Integ earned tens of thousands of dollars over the years under side consulting agreements.

23.     TEDSI's actions were in furtherance of the conspiracies detailed below, as TEDSI was hired to do construction management that it knew Integ / Garza, Jr. were supposed to do.

24.     In or around 2005, the District investigated going forward with MDS Phase II. The estimated cost was almost $500 million. Recognizing that was too much to bear for local taxpayers, the Board authorized a bond referendum for one hundred million dollars. The bonds were to fund the following Phase II projects:

| Name[17] | Date Started | Date Ended |
|---|---|---|
| W-06-00 (La Villa) | 10/31/2006 | N/A |
| W-01-00 (Weslaco Drain) | 3/13/2017 | N/A |
| J-02-00 (Monte Cristo) | 10/31/2006 | N/A |
| Alamo Drain | 3/21/2007 | 2008 |
| McAllen-Pharr South Drain | 9/27/2005 | N/A |
| Jackson Drain | 11/7/2006 | N/A |
| Penitas Drain | 10/13/2005 | N/A |
| Goodwin Drain | 7/5/2005 | Unknown, Project Completed by TxDOT |
| Linda Vista Drain | 7/5/2005 | Unknown, Project Completed by TxDOT |
| Mission Inlet Drain | 9/27/2005 | 2010 |
| Detention Ponds | N/A | N/A |
| Raymondville Drain | 2000 | N/A |

---

[17] Collectively hereinafter, the "Phase II projects."

25.     Each project needed to be planned and engineered. In all cases where "Date Ended" is "N/A," no actual construction ever happened. Significant engineering work costing millions of dollars, however, was done on some of the projects.

26.     In addition to the Phase II projects, the Board included levee rehabilitation projects that were not part of Phase II. The Board allocated $10 million to levee rehabilitation.

### D.     The Border Wall

27.     In the spring of 2007, federal government workers alerted property owners across the Rio Grande Valley that a border fence was going to cut across the owners' land.[18] The Department of Homeland Security ("DHS") had only a year to build 60 miles of fence in the Valley.[19] The rush to build the fence turned into a gold rush for Godfrey Garza, Jr.

28.     While the District had earmarked some of the 2006 bond funds for levee improvements, those levee improvements were separate and apart from MDS Phase II. Only ten percent of the bond funds ($10 million) were supposed to go to levee improvement. Even though the percentage of total funds dedicated to levees was low, there was no doubt that Hidalgo County's levees needed work.

29.     The interests of the District and the DHS appeared to intersect. After much negotiation, DHS agreed to improve a series of levees and build its fence on top of the newly

---

[18] T. Christian Miller, Kiah Collier and Julian Aguilar, *The Taking: How the federal government abused its power to seize property for a border fence,* The Texas Tribune, Dec. 14, 2017, https://www.texastribune.org/2017/12/14/border-land-grab-government-abused-power-seize-pro perty-fence/.

[19] T. Christian Miller, Kiah Collier and Julian Aguilar, *How a South Texas bureaucrat became a multimillionaire amid the rush to build a border fence,* The Texas Tribune, Dec. 29, 2017, https://www.texastribune.org/2017/12/29/how-south-texas-bureaucrat-became-multimillionaire-a mid-rush-build-bor/

fortified structures.[20] The levee improvements would be funded both by DHS and the District.

To pay the District's share, Godfrey Garza, Jr. recommended re-routing the 2006 bond money

to the DHS project. This federal project consisted of the following levee segments:

- DHS 0-4A

- DHS 0-4C

- DHS 0-5

- DHS 0-6A

- DHS 0-6BC

- DHS 0-7

- DHS 0-8

- DHS 0-9 PH I

- DHS 0-9 PH II

- DHS 0-10[21]

30.     DHS made its Federal Financial Assistance Award on May 2, 2008. Ex. MM.

The award called for a federal share of $65,700,000 plus a nonfederal share of $48,166,594

for a total of $113,866.594. *Id.* The "Recipient Contact" was Godfrey Garza, Program

Manager, Hidalgo County Drainage District No. 1. Integ was listed nowhere on the Award. *Id.*

---

[20] *Id.*

[21] Collectively hereinafter, the "federal project," the "federal levee project," or the "DHS project."

31.     The Award expressly called for "substantial federal involvement" in that DHS, CBP, IBWC, and U.S. Army Corps of Engineers were to participate in implementing the project. Id. Federal payments were made in advance through the District's cognizant agency, U.S. Department of Health and Human Services via electronic payment. *Id.* The District's use of the electronic payment system depended on accurate financial reporting. *Id.* Moreover, DHS was to withhold payment if for any failure to adhere to grant requirements. 44 C.F.R. § 13.21(g)(I).

32.     Plaintiff adopts and incorporates the requirements and conditions stated in the Award and its Amendments (Exhibits MM to QQ) as if fully set forth here.

33.     The Award was amended four times:

| Date | New Federal Share | New HCDD1 Share |
|------|-------------------|------------------|
| 09/30/2008 | $134,740,248.00 | $44,815,140.11 (Ex. NN) |
| 11/04/2008 | $174,474,062.63 | $58,166,594.00 (Ex. OO) |
| 02/05/2010 | Unchanged | Unchanged (Ex. PP) |
| 06/04/2010 | Unchanged | Unchanged (Ex. QQ) |

34.     Garza, Jr. signed the amendment dated 06/04/2010, listing himself as District Manager, Hidalgo County Drainage District No. 1. Ex. QQ. Again, he failed in this statement to disclose his relationships with Integ and VDCS and failed to disclose he was getting a percentage of costs on the federal project.

35.     The 2010 amendment said engineering costs had to be validated with "source documentation." Garza, Jr. and Integ failed to state in such source documentation that Integ received a percentage of engineering fees related to the federal project. Ex. QQ.

36.     As a grant condition, Garza, Jr. and Integ (on behalf of the District) agreed to have the county auditor act as an extra set of eyes on Award disbursements. Specifically, it was agreed between DHS and the District that the Hidalgo County Auditor would audit all payments relating to the federal project. When Garza, Jr. and Integ made the agreement, they never intended to abide by it. They specifically directed the District's financial officer not to submit Integ payments to the auditor.

**E.     The first scheme: illicitly getting paid on projects and work to which the contract did not apply**

37.     After the '06 bond funds issued, preliminary engineering work began on the dates stated earlier for the Phase II projects. It became clear that, for many of the projects, years would pass before construction started. Under its plain and ordinary meaning, "actual construction costs" means costs for building something tangible. Without money being spent on "actual construction costs" Garza would not make his commission.

38.     Garza wanted to make money. So he lied. He told the District Financial Officer that "actual" construction costs really meant "all costs." He wanted a piece of the engineering work and the building work. He also lied and told the Financial Officer that the levee work (including the federal project) was part of MDS Phase II.

39.     On or about April 11, 2008, Integ and Godfrey Garza, Jr. invoiced the District for $119,861.72. Ex. B. The invoice charged 1.5% of costs, most of which were not actual construction costs. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice

date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

40.    On or about May 28, 2008, Integ and Godfrey Garza, Jr. invoiced the District for $66,442.95. Ex. C. The invoice charged 1.5% of costs, most of which were not actual construction costs. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

41.    On or about September 26, 2008, Integ and Godfrey Garza, Jr. invoiced the District for $73,214.00. Ex. D. The invoice charged 1.5% of costs, most of which were not actual construction costs. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

42.    On or about February 25, 2009, Integ and Godfrey Garza, Jr. invoiced the District for $197,528.00. Ex. E. The invoice charged 1.5% of costs, most of which were not actual construction costs. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

43.     On or about February 25, 2009, Integ and Godfrey Garza, Jr. invoiced the District for $1,673,434.93. Ex. F. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, Annie Q. Garza, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date.

44.     On or about May 21, 2009, Integ and Godfrey Garza, Jr. invoiced the District for $55,311.77. Ex. G. The invoice charged 1.5% of costs, most of which were not actual construction costs. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

45.     On or about May 21, 2009, Integ and Godfrey Garza, Jr. invoiced the District for $765,719.20. Ex. H. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

46.     On or about June 24, 2009, Integ and Godfrey Garza, Jr. invoiced the District for $226,976.17. Ex. I. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice

amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

47.     On or about January 6, 2010, Integ and Godfrey Garza, Jr. invoiced the District for $244,858.67. Ex. J. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

48.     On or about June 15, 2010, Integ and Godfrey Garza, Jr. invoiced the District for $111,921.43. Ex. K. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

49.     On or about November 23, 2010, Integ and Godfrey Garza, Jr. invoiced the District for $24,756.77. Ex. L. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

50.     On or about June 21, 2011, Integ and Godfrey Garza, Jr. invoiced the District for $29,083.22. Ex. M. After credits, the District paid $27,116.62 on the invoice. Id. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

51.     On or about October 13, 2011, Integ and Godfrey Garza, Jr. invoiced the District for $9,609.44. Ex. N. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

52.     On or about January 20, 2012, Integ and Godfrey Garza, Jr. invoiced the District for $1,295.41. Ex. O. The invoice charged 1.5% of total costs, as opposed to actual construction costs, for work done on the federal project and non-construction costs for MDS Phase II. In submitting the invoice, Integ, and Godfrey Garza, Jr. caused a check to be mailed through the US Postal Service for the invoice amount within a few days of the invoice date. Integ, Annie Garza and/or Godfrey Garza, Jr. delivered the invoice that caused the check to be mailed.

53.     From on or about September 4, 2013 to the present, Integ and Godfrey Garza, Jr. attempted to be paid approximately $84,000.00 as 1.5% compensation for the Raymondville Drain project. Ex. P. Unfortunately, while the work was related to a Phase II project, Integ and Godfrey Garza, Jr. were again trying to be paid on engineering fees instead of actual construction costs. Integ and Godfrey Garza, Jr. were told that in order to be paid the item would have to be placed on an open meeting agenda. Integ and Godfrey Garza, Jr. did not want to discuss the item at a public meeting.

54.     On or about February 24, 2017, Integ filed a counterclaim against Plaintiff in which it sought payment of the $84,000.

55.     On or about February 1, 2018, Integ amended its counterclaim and continued to seek payment of the $84,000.00.

56.     On or about February 26, 2018, Integ filed a Notice of Appeal after its counterclaim was dismissed.

57.     Integ continues to seek payment of the $84,000.00 through its appeal.

58.     Every time Integ and Godfrey Garza, Jr. invoiced the District, they represented the invoices were true and correct, were for actual construction costs, and were related to MDS Phase II. Those representations were false and were made in furtherance of the racketeering scheme further detailed in this Complaint.

59.     Every time Integ, Godfrey Garza, Jr. and Annie Garza delivered an Integ invoice to the District, they also represented the invoices were true, correct, and valid.

60.     Integ and Godfrey Garza, Jr. caused to be placed all checks made in payment of the invoices identified above through January 20, 2012 on the District's "consent agenda." The "consent agenda" is a group of administrative items voted on in a block. No discussion takes place on the items individually. As District Manager, Integ and Godfrey Garza, Jr. were authorized to decide what items were placed on the agenda and whether the items were placed on the regular or consent agenda.

61.     Godfrey Garza, Jr. caused all of the checks made to pay the above-identified invoices through the consent agenda. Godfrey Garza, Jr. did that knowing Board Members would not look at the individual checks, and knowing he had the trust of the Board Members. By placing check registers that included payments to Integ/Godfrey Garza, Jr. on the consent agenda, Godfrey Garza, Jr. and Integ represented the checks were proper in all respects and in payment of valid debts. These representations were false and made in furtherance of the racketeering scheme detailed in this Complaint.

62.     It is important to note here that government operates through a vast group of hardworking public servants. A governing body provides oversight but, at the end of the day, the governing body must trust its managers and rely on its managers' judgment. If a governing body had to review every administrative matter and check, the body would never be able to get any actual policy work done.

63.     Beyond placing checks on the consent agenda, Integ and Godfrey Garza, Jr. directed District staff to procure his checks in a way that would avoid detection by the county

auditor. Specifically, in or around 2007, he specifically said he did not want Integ's checks reviewed by the county auditor.

**F.    The second scheme: bribery through Valley Data**

64.    Valley Data Collection Specialists, Inc. ("VDCS") registered as a corporation with the Texas Secretary of State on June 24, 2004. Ex. AA. The stated aim of VDCS was to perform data collection that could be used by surveyors and other persons interested in land parcels. At its inception, Jonathan Garza and Godfrey Garza, III ("Trey Garza" or "Garza, III") owned VDCS. Ownership was transferred to Annie Garza (Godfrey Garza, Jr.'s wife) in or around 2012. Ex. Y, Z.

65.    The real purpose of VDCS eventually turned to a kickback vehicle and money laundering machine. As manager, Integ/Godfrey Garza, Jr. negotiated prime contracts for the District with engineering firms. Dannenbaum Engineering Company and Dannenbaum Engineering Company-McAllen, LLC (collectively, "DEC"), Dos Logistics and TEDSI hired VDCS as a subcontractor on several District projects.

66.    In or around 2004 Godfrey Garza, III visited Daniel Rios of S&B Infrastructure to solicit work from Mr. Rios. Trey Garza implied that his father (Garza, Jr.) would be happy if S&B hired Valley Data. This was during a time when S&B had significant business with the District and was working on getting more business. Based on his interactions with the Garzas and their companies, Mr. Rios believed (1) Garza, Jr. wanted firms to hire Valley Data to

benefit Garza, Jr. and his family; and (2) that Garza, Jr. gave some work to firms in return for them hiring Valley Data.

67.     The following standards required the Contractor Defendants to disclose they had hired VDCS:

- The contracts between Plaintiff and the Contractor Defendants. *E.g.*, Ex. R at Art. 14.

- Tex. Loc. Gov't. Code § 176.006.

- 22 T.A.C. § 137.55

- 22 T.A.C.  § 137.57.

- Tex. Penal Code § 36.02.

- 22 T.A.C. § 137.63.

68.     The following standards required Integ and Garza, Jr. to disclose VDCS was hired by the District's contractors (including, but not limited to, DEC):

- The contract between Integ and Plaintiff. Ex. FF at § 1.1(A)(1), (3)-(11), (14); § 1.1(B)-(C), § 9.

- Tex. Loc. Gov't. Code § 176.006.

- Tex. Penal Code § 36.02.

- Tex. Loc. Gov't. Code § 171.004.

69.     The following standards required VDCS to disclose its business relationship (as defined under the Texas Local Government Code[22]) with the District:

- Tex. Loc. Gov't. Code § 176.006.

- The contracts between VDCS and DEC. Ex. S and T at Part 1; ¶ 10.05.

- Tex. Penal Code § 36.02.

70.     Defendants never disclosed to the District: (1) that VDCS was hired; or (2) that VDCS was owned by Godfrey Garza, Jr.'s immediate family. Integ and Godfrey Garza, Jr. had an affirmative duty to disclose that his family's company would be paid on District projects. DEC had an affirmative duty to disclose they contracted with VDCS and that VDCS was owned by Godfrey Garza, Jr.'s family.

71.     Between 2006 and 2014, VDCS sent the following invoices[23],[24]:

| Date | Amount | Contractor | Project |
|------|--------|------------|---------|
| 6/16/2006 | $7,060.00 | Tedsi | Mile 6 |
| 9/7/2006 | $7,060.00 | Tedsi | Mile 6 |
| 10/31/2006 | $3,662.80 | Tedsi | Canton RR Crossing |
| 11/2/2006 | $36,239.20 | Tedsi | Trenton Road |
| 11/30/2006 | $102,060.00 | Tedsi | J-02 |
| 11/30/2006 | $76,239.80 | Tedsi | W-01 La Villa and J-02 |
| 12/29/2006 | $29,160.00 | Tedsi | Monte Cristo |
| 2/7/2007 | $14,580.00 | Tedsi | Monte Cristo |

---

[22] "Business relationship" means a connection between two or more parties based on commercial activity of one of the parties. Tex. Loc. Gov't Code § 176.001(1-a).

[23] All invoices are attached as Exhibit P.

[24] Invoices marked with an asterisk (*) are for work on federal projects.

| 2/15/2007 | $60,991.84 | Tedsi | W-01 La Villa |
|-----------|------------|-------|---------------|
| 2/20/2007 | $15,274.96 | Tedsi | W-01 La Villa |
| 4/25/2007 | $8,781.00 | Tedsi | Not Stated |
| 4/30/2007 | $39,823.00 | Tedsi | Consulting |
| 6/19/2007 | $17,067.00 | Tedsi | W-06 |
| 7/30/2007 | $26,505.00 | Tedsi | Mile 2 |
| 9/12/2007 | $113,500.00 | DEC | Common Levee |
| 10/11/2007 | $10,500.00 | L&G | Common Levee |
| 11/27/2007 | $21,000.00 | L&G | Phase II Levee |
| 11/28/2007 | $113,500.00 | DEC | Common Levee |
| 12/12/2007 | $15,250.00 | L&G | Common Levee |
| 1/9/2008 | $22,000.00 | Tedsi | Monte Cristo |
| 1/29/2008 | $4,000.00 | Tedsi | La Villa |
| 2/18/2008 | $22,000.00 | Tedsi | Monte Cristo |
| 3/20/2008 | $2,500.00 | Tedsi | Weslaco Drain |
| 3/31/2008 | $12,500.00 | L&G | Levee |
| 4/22/2008* | $5,500.00 | L&G | 0-7 |
| 4/22/2008* | $6,500.00 | L&G | 0-8 |
| 4/30/2008* | $5,000.00 | L&G | 10 |
| 4/30/2008* | $7,750.00 | L&G | 09 |
| 5/13/2008* | $2,000.00 | L&G | 8 |
| 5/13/2008* | $2,500.00 | L&G | 9 |
| 5/15/2008* | $1,000.00 | L&G | 7 |
| 5/19/2008* | $1,500.00 | L&G | 10 |
| 6/16/2008* | $2,200.00 | DL | 0-7A |
| 6/16/2008* | $3,575.00 | DL | 0-9A |
| 6/16/2008* | $5,500.00 | DL | 0-10A |
| 6/16/2008* | $11,000.00 | L&G | 6 |

| | | | |
|---|---|---|---|
| 6/20/2008* | $13,750.00 | DL | 0-6B |
| 6/20/2008* | $21,175.00 | DL | 0-6C |
| 6/20/2008* | $71,225.00 | DL | 0-6A |
| 4/7/2009 | $41,000.00 | Tedsi | Mile 2 |
| 5/21/2009 | $4,600.00 | Tedsi | Mile 2 |
| 9/23/2009 | $1,000.00 | L&G | Pump House |
| 2/26/2010 | $29,525.76 | Tedsi | J09 |
| 3/31/2010 | $84,522.24 | Tedsi | J09 |
| 4/27/2010 | $5,248.00 | Tedsi | Bentsen Palm |
| 5/26/2010 | $25,344.00 | Tedsi | J-09 |
| 8/6/2010 | $15,000.00 | Tedsi | J-09 |
| 10/30/2010 | $50,200.00 | Tedsi | J-09 |
| 11/30/2010 | $16,300.00 | Tedsi | J-09 |
| 1/19/2011 | $64,000.00 | Tedsi | J-09 |
| 10/30/2011 | $16,375.00 | Tedsi | Edinburg WWTP |
| 11/18/2011 | $993.40 | Tedsi | J-09 |
| 11/18/2011 | $1,293.40 | Tedsi | J-09 |
| 11/30/2011 | $13,100.00 | Tedsi | Edinburg WWTP |
| 12/22/2011 | $3,275.00 | Tedsi | Edinburg WWTP |
| 12/30/2011 | $37,500.00 | Tedsi | J-09 |
| 7/26/2012 | $3,750.00 | Tedsi | J-09 |
| 10/31/2012 | $4,913.20 | Tedsi | J-09 |
| 11/15/2012 | $3,800.00 | Tedsi | Mile 2 |
| 12/28/2012 | $1,600.10 | Tedsi | Owassa |
| 1/11/2013 | $800.00 | Tedsi | J-09 |
| 3/25/2013 | $1,923.20 | Tedsi | Edinburg Master Drainage Plan |
| 3/26/2013 | $16,150.00 | Tedsi | Mile 2 |
| 4/29/2013 | $33,586.85 | Tedsi | S. Mercedes Drain, et |

| | | | al. |
|---|---|---|---|
| 5/3/2013 | $11,073.61 | Tedsi | IBWC Pumps |
| 6/14/2013 | $3,000.00 | Tedsi | IBWC Pumps |
| 6/24/2013 | $3,729.65 | Tedsi | S. Mercedes Drain, et al. |
| 8/12/2013 | $12,522.00 | Tedsi | Edinburg WWTP |
| 10/17/2013 | $12,522.00 | Tedsi | Edinburg WWTP |
| 10/25/2013 | $27,520.00 | Tedsi | J-09 |
| 11/6/2013 | $13,760.00 | Tedsi | J-09 |
| 11/29/2013 | $17,200.00 | Tedsi | J-09 |
| 12/6/2013 | $7,667.00 | Tedsi | Mile 2 |
| 12/17/2013 | $7,123.75 | Tedsi | Spanish Palms |
| 12/30/2013 | $10,320.00 | Tedsi | J-09 |
| 2/28/2014 | $38,400.00 | Tedsi | Edinburg Master Drainage Plan |
| 3/31/2014 | $14,190.00 | Tedsi | Edinburg Master Drainage Plan |
| 4/22/2014 | $29,919.48 | Tedsi | J-09 |
| 5/2/2014 | $7,000.00 | Tedsi | J-09 |
| 8/6/2014 | $6,204.74 | Tedsi | J-09 |
| 10/17/2014 | $6,300.00 | Tedsi | Mile 2 |
| 9/5/2013 | $12,896.00 | LeFevre | Weslaco Lateral |

72.     Those invoices total $1,658,577.98 paid by Plaintiff (through contractors) to a company owned by Godfrey Garza, Jr.'s family, and in which, after 2012, Godfrey Garza, Jr. himself had an ownership interest.

73.     Annie Q. Garza, Jonathan Garza, and Godfrey Garza, III all caused some or all of the above invoices to be sent to the identified contractors by hand delivery, email, and/or facsimile. As owners, all three also caused checks to be mailed via the US Postal Service in payment of the invoices.

74.     Godfrey Garza, Jr. never disclosed his ownership interest (nor that of his family) in VDCS even though he had contractual, common law, and statutory duties to do so. The above-listed contractors all had contracts with the District negotiated by Godfrey Garza, Jr. Godfrey Garza, Jr. pressured and/or asked the contractors to hire VDCS. If the contractors agreed to hire VDCS, Godfrey Garza, Jr. then argued to the District Board for the contractors to be awarded projects.

75.     When Godfrey Garza, Jr. recommended to the District that contracts be awarded to the Contractor Defendants, he represented to the District the contracts were fair and reasonable, and that entering into the contracts was in the best interests of the District. He also represented that he did not have a conflict of interest in negotiating with and selecting the Contractor Defendants. The District relied on those representations to its detriment and entered into the prime contracts in reliance on Godfrey Garza, Jr.'s representations. As a result, District money was funneled to VDCS as a kickback to Godfrey Garza, Jr. VDCS was paid more than fair market value for its supposed services, and in fact did not render some of the services for which it charged.

76.     Defendants all conspired to make the kickbacks happen. Specifically, VDCS, Annie Q. Garza, Jonathan Garza and Godfrey Garza, III caused the above-listed invoices to

be submitted when they knew the received payments were Godfrey Garza, Jr.'s kickbacks. VDCS, Annie Q. Garza, Jonathan Garza, and Godfrey Garza, III deposited the illicitly gotten money into federally insured bank accounts. They then funneled some of the money back to Integ and Godfrey Garza, Jr. disguised as rent and loan payments, in effect laundering the money. It was Integ and Godfrey Garza, Jr.'s job in the conspiracy to make sure VDCS got hired and paid above market value or that nobody looked at VDCS's actual qualifications.

77.     Integ and Godfrey Garza, Jr. intentionally bypassed District procurement requirements in order to get him and Integ paid, and to hide DEC's, VDCS's, Annie Garza's, Trey Garza's and Jonathan Garza's involvement in the scheme.

**G.     The Contractor Defendants' roles in the schemes**

78.     DEC is a well-known engineering firm that operates throughout Texas. Louis Jones was DEC's chief representative in McAllen.

79.     Dos Logistics, Inc. ("Dos") and TEDSI Infrastructure Group, Inc. were, at all relevant times, engineering firms that worked on District projects.

80.     Godfrey Garza, Jr. negotiated major contracts with DEC, Dos, and TEDSI that resulted in substantial payment to VDCS.

81.     Godfrey Garza, Jr. could not have accomplished the purposes of his racketeering activity without the Contractor Defendants' help.

82.     On or about November 7, 2006, the District contracted with DEC to for work on a levee improvement project. Ex. R. This project was not part of MDS Phase II. DEC's

border fence work was done under this contract, and some of the money paid to DEC was paid using federal dollars.

83.     On or about April 24, 2007 and September 9, 2014, the District contracted with Dos on public works projects.  Ex. RR, SS.

84.     On or about March 23, 2004 and April 9, 2013, the District contracted with TEDSI on public works projects.  Ex. TT, UU.

85.     Article 14 of the District's contracts with the Contractor Defendants included promises from the Contractor Defendants that they would not "assign, subcontract, or transfer its interest in [the contract] without the prior written consent of [the District]." Ex. R at p. 18.

86.     In violation of their promises to get prior written consent before subcontracting and as conspirators to avoid detection of VDCS's work, the Contractor Defendants contracted with VDCS on District projects.

87.     On or about February 12, 2007, DEC and VDCS entered into an "Agreement for Professional Engineering Services." Ex. S. The contract said VDCS would provide "engineering services." The scope of services said VDCS would provide a "registered professional land surveyor." In fact, VDCS employed no licensed engineers or even any registered professional land surveyors.

88.     On or about June 7, 2007, DEC and VDCS entered into another "Agreement for Professional Engineering Services." Ex. T. VDCS lacked qualified personnel to do the promised work.

89.     On the dates identified in the table at paragraph 71 of this Complaint, VDCS invoiced TEDSI and Dos for work on District projects.

90.     The Contractor Defendants did not get "prior written consent" from the District to hire VDCS. The Contractor Defendants never informed the District they were contracting with an entity in which Godfrey Garza, Jr.'s family had an interest. Godfrey Garza, Jr. never informed the district his family's company was being paid on District jobs.

91.     Under the 2006 DEC contract, DEC and VDCS entered into various work authorizations ("WA") and supplemental agreements ("SA") to carry out the contract's purpose. The following WA's and SA's were entered into and each was for surveying, topographic, and right of way services:

| Contract/Agreement[25] | Date | Amount |
|---|---|---|
| SA#1 to WA#1 | 11/7/2006 | $199,890.27 |
| SA#1 to WA#2 | 4/24/2007 | $441,573.30 |
| SA#1 to WA#4 | 8/28/2007 | $280,011.50 |
| SA#1 to WA#5 | 2/20/2008 | $52,800.00 |
| SA#2 to WA#5 | 2/20/2008 | $2,600.00 |
| SA#1 to WA#7 | 2/20/2008 | $72,900.00 |
| SA#2 to WA#7 | 2/20/2008 | $3,645.00 |
| SA#6 to WA#7 | 6/3/2008 | $2,400.00 |
| SA#1 to WA#8 | 2/20/2008 | $96,000.00 |
| SA#2 to WA#8 | 2/20/2008 | $4,800.00 |

---

[25] The Supplemental Agreements are attached as Exhibit V.  Under the TEDSI and Dos contracts, those contractors also entered into WA's and SA's for surveying, topographic, and right of way services to carry out the contracts' purposes. These WA's and SA's were used to funnel money to VDCS.

| SA#1 to WA#9 | 2/20/2008 | $116,100.00 |
|---|---|---|
| SA#2 to WA#9 | 2/20/2008 | $5,805.00 |
| SA#6 to WA#9 | 6/3/2008 | $11,928.00 |
| SA#1 to WA#10 | 2/20/2008 | $72,900.00 |
| SA#2 to WA#10 | 2/20/2008 | $3,645.00 |
| SA#6 to WA#10 | 6/3/2008 | $6,000.00 |
| SA#2 to WA#12 (for 6A) | 5/27/2008 | $77,700.00 |
| SA#3 to WA#12 (for 6A) | 5/27/2008 | $3,885.00 |
| SA#2 to WA#13 (for 6B) | 5/27/2008 | $15,000.00 |
| SA#3 to WA#13 (for 6B) | 5/27/2008 | $750.00 |
| SA#2 to WA#14 (for 6C) | 5/27/2008 | $23,100.00 |
| SA#3 to WA#14 (for 6C) | 5/27/2008 | $1,155.00 |
| | | |
| **Total:** | | **$1,494,588.07** |

92.    Godfrey Garza, Jr. and Integ presented the Contractor Defendants' SA's and WA's to the Board of Directors and recommended they be approved. In doing so, he never disclosed the Contractor Defendants' use of VDCS or his family's ownership interest in VDCS. By presenting the WA's and SA's to the Board, Godfrey Garza, Jr. and Integ represented the agreements were fair and reasonable for the District, that there was no conflict of interest in the transactions, and that none of Garza, Jr.'s family members would receive money from the transactions.

93.    By signing the SA's, the Contractor Defendants represented that the transactions did not cause any conflict of interest, that the Contractor Defendants would obtain

the District's written authorization before paying VDCS any money, and that the transactions did not include any kickback or bribery monies.

94.     In cruel irony, Godfrey Garza, Jr. improperly got a percentage of the money paid to the Contractor Defendants that in turn was paid to VDCS. By submitting their invoices, Godfrey Garza, Jr./Integ represented that no money would be paid by the District as a percentage of work done by Godfrey Garza, Jr.'s family. Godfrey Garza, Jr. had an interest in negotiating and later paying inflated rates to the Contractor Defendants and the other contractors because Godfrey Garza, Jr. would benefit directly from his 1.5% deal, and because his family would benefit through funds paid to VDCS (some of which Godfrey Garza, III, Jonathan Garza, Annie Q. Garza and VDCS routed back to Godfrey Garza, Jr. and/or Integ through sham loan and rent payments). When Integ and Godfrey Garza, Jr. presented their invoices to the District, they ended up getting 1.5% of all money paid to VDCS because Godfrey Garza, Jr. misrepresented VDCS had charged for "actual construction costs."

95.     If Godfrey Garza, Jr., the Contractor Defendants or Integ had disclosed their illicit relationships, Plaintiff would not have paid on the WA's.

96.     By presenting the SA's to the District, the Contractor Defendants caused checks in payment of the SA's to be mailed through the US Postal Service. By presenting the SA's to the Board, Godfrey Garza, Jr. and Integ also caused checks in payment of the SA's to be mailed through the US Postal Service.

97.     Daniel Rios, of S&B Infrastructure, once heard Louis Jones (a DEC principal) tell a story about a bridge project DEC did in Brownsville, Texas. According to Mr. Rios, Jones said

a Mexican official pushed back on going forward with the project because DEC had not turned

in any planning documents. Mr. Jones said, in the presence of Mr. Rios: "That guy shouldn't

be complaining because I already paid him off."

**H.    The third scheme: construction management scam**

98.     By asking the Board to pay him for construction management and later charging

for construction management, Godfrey Garza, Jr. represented the services were fairly priced,

reasonable, and necessary to the District.

99.     In fact, Godfrey Garza, Jr. negotiated a contract with DEC that required DEC

to do construction management. On the federal project alone, Godfrey Garza, Jr. presented

the following SA's that constituted payment to DEC for construction management:

| Contract/Agreement[26] | Date | Amount |
|---|---|---|
| SA#2 to WA#3 | 4/14/2008 | $237,643.08 |
| SA#4 to WA#3 | 4/14/2008 | $213,926.85 |
| SA#5 to WA#3 | 4/14/2008 | $551,533.48 |
| SA#5 to WA#4 | 4/14/2008 | $311,058.68 |
| SA#4 to WA#5 | 4/14/2008 | $267,847.83 |
| SA#5 to WA#6 | 4/14/2008 | $50,750.00 |
| SA#4 to WA#7 | 4/14/2008 | $112,043.25 |
| SA#7 to WA#7 | 6/3/2008 | $27,260.00 |
| SA#4 to WA#8 | 4/14/2008 | $404,600.64 |
| SA#4 to WA#9 | 4/14/2008 | $481,785.99 |
| SA#7 to WA#9 | 6/3/2008 | $14,910.00 |

---

[26] Attached as Exhibit U.

| SA#4 to WA#10 | 4/14/2008 | $296,520.68 |
|---|---|---|
| SA#7 to WA#10 | 6/3/2008 | $21,022.60 |
| SA#1 to WA#11 | 4/14/2008 | $44,017.90 |
| SA#1 to WA#12 | 4/14/2008 | $392,370.44 |
| SA#1 to WA#13 | 4/14/2008 | $80,031.33 |
| SA#1 to WA#14 | 4/14/2008 | $153,009.31 |
| | | |
| **Total:** | | **$3,660,332.06** |

100.   Godfrey Garza, Jr. presented these SA's to the District board at or near the dates stated above. By doing so, he represented the SA's were in payment of necessary services and not in payment of duplicated services. By presenting the SA's to the District, DEC caused checks in payment of the SA's to be sent through the US Postal Service. By presenting the SA's to the Board, Godfrey Garza, Jr. and Integ also caused checks in payment of the SA's to be mailed through the US Postal Service.

101.   In reality, Godfrey Garza, Jr. and Integ did not perform the construction management services. Integ had no full time employees other than Godfrey Garza, Jr. In fact, Integ's only other employee was Annie Garza, who only did part time clerical work. In addition to working with the District, Integ and Godfrey Garza, Jr. also served as the Hidalgo County Regional Mobility Authority and supposedly managed a project for the RMA at the same time. There is no way one person actually could have done all the work that Integ billed for. Godfrey Garza, Junior and Integ were paid approximately $600,000.00 for the work allegedly done for the RMA during the same time it was billing millions of dollars to the District. *See* Ex. Y.

102.    Moreover, DEC and DOS did all relevant construction management. Ex. BB ¶ 10. Garza, Jr. thus could not have done any construction management, and was not qualified to do so. *Id.* at ¶ 12.

103.    Finally, once the federal project was complete, the District tried to be reimbursed for certain pre-award costs.  Once DHS found out Garza, Jr. and Integ had gotten a percentage of costs as a construction management fee, DHS said it would never have approved the award had it known about Integ's / Garza, Jr.'s interests.  The Board has not been able to collect the $2.1 million in pre-award costs.

I.    **The Integ and VDCS Defendants commingled money**

104.    Godfrey Garza, Jr. formed Integ on June 20, 1991. Ex. Y at 13:24 to 25:4. The company originally had two shareholders, id. at 14:5-7, but Garza, Jr. bought out the other shareholder for ten dollars in 1992. Id. at 19:24 to 20:3. Garza, Jr. was married to Annie Garza when he formed Integ. Id. at 20:22-24. The couple have never had a written agreement setting out Integ's shares as separate property. Id. at 21:4-21. They never had an agreement that if they divorced, that any stock or other corporate ownership interests would not count as community property for division of the marital estate. Id. at 22:15-21. Garza, Jr. and his wife thus have community property interests in their respective companies.[27]

---

[27]  Property acquired during a marriage in Texas is presumptive community property. *Lesikar v. Rappeport*, 33 S.W.3d 282, 297 (Tex. App.–Texarkana 2000). *Lesikar* concerned allegations that an executrix committed fraud and breach of fiduciary duty. *Id.* The court found that when the executrix's husband acquired an oil well interest, the executrix did as well under community property law. *Id.*

105. When Garza, Jr. received money from Integ, he deposited it into his only personal account (one he held jointly with his wife). *Id*. at 24:24; 25:8-13 He did nothing to segregate the money he got from Integ. *Id*. at 25:15-18. Moreover, Annie Garza was a signatory on Integ's bank account. *Id*. at 26:10-16. Mrs. Garza was also Integ's employee. *Id*. at 26:18-19

106. Godfrey Garza, Jr.'s sons (Jonathan Garza and Godfrey "Trey" Garza, III) formed Valley Data Collection Specialists in 2004. Ex. AA at 3. Trey and Jonathan transferred their shares in Integ in or around 2012. Annie Garza was owner by 2012. Ex. Y at 128:3-22. Trey Garza signed his last Public Information Report for Valley Data on May 15, 2012, and Annie Garza listed herself as President on April 26, 2013. Ex. AA at 14. Garza, Jr. and Annie Garza were married when Trey and Jonathan transferred their shares in Valley Data to Annie Garza. Ex. Y at 20:25 to 21:3.

107. Integ allegedly loaned between $75,000 and $100,000 to Valley Data in 2008 or 2009. Ex. Y. at 92:8-10. There was no written agreement documenting the loan. *Id*. at 93:6-8. Valley Data allegedly repaid the loan, *id*. at 9-11, but there is no real documentation of what payments were made and when. *Id*. at 93:12-16. Garza, Jr. said the only way he kept track of whether the loan was repaid was on tax returns as "money due or money out." *Id*. at 94:12-21. There is no other place Garza, Jr. kept track of what was borrowed or what was paid. *Id*. Integ charged no interest on the loan and cannot say how much money Valley Data paid on the "loan." *Id*. at 95:1-17. Integ says its only other loans to Valley Data were in small amounts of $500 to $2,000 from time to time. *Id*. at 92:18-22. Integ sometimes made the loans to

Valley Data so Valley Data could in turn give the money to Garza, Jr.'s son. *Id*. at 92:18 to 93:1. The loans were also used to make payroll and pay bills. *Id*. at 93:4-5.

108.   Integ supposedly never leant money to anyone other than Valley Data. *Id*. at 96:11-13. When asked directly if Integ loaned money to Garza, Jr.'s wife and children, he said, "I don't recall." *Id*. at 96:14-16. Bank records, however, show a $90,000 cashier's check to Jonathan Garza on December 29, 2006. Ex. DD at 1. On April 18, 2008, Integ purchased two cashier's checks for $25,000 each. *Id*. at 15. One was payable to "Annie Q. Garza or Jonathan Garza" and the other to "Godfrey Garza, Jr. or Godfrey Garza, III." Id. The same day, Godfrey Garza, Jr. transferred $60,000 to another account. *Id*. On October 31, 2008, Integ purchased two more cashier's checks payable to "Godfrey Garza, Jr. or Godfrey Garza, III." Ex. Q at 17. One check was for $25,000 and the other for $40,000. *Id*.

109.   Integ paid a salary to Annie Garza for periodic work she did "every year." Ex. Y at 59:6-7. She got paid weekly and taxes were withheld. *Id*. at 59:13-19. Bank records, however, show Integ gave Annie thousands of dollars in checks with no taxes withheld. Ex. DD at 2-10; 12-13. Integ also gave money to Jonathan Garza and Valley Data. Id. at 11, 14.

110.   Integ rented an office building to Valley Data, and Valley Data paid rent "whenever they had money available." Ex. Y at 56:18-22. There was no written lease agreement between Integ and Valley Data. Id. at 57:13-23. Valley Data would not pay rent every month and paid "whatever they could pay." *Id*. Garza, Jr. cannot remember the amounts, or even a range of amounts Valley Data paid in "rent." *Id*. at 133:1-12.

**J.      Other misrepresentations**

111.    Defendants caused to be made the following false statements:

| Date | Document | Period Begin | Period End | Exhibit KK Page |
|------|----------|--------------|------------|-----------------|
| 7/29/2008 | Form 272 | 4/1/2008 | 6/30/2008 | 1 |
| 10/29/2008 | Form 269A | 7/1/2008 | 9/30/2008 | 2 |
| 1/30/2009 | Form 269A | 10/1/2008 | 12/31/2008 | 3 |
| 2/13/2009 | Form 272 | 10/1/2008 | 12/31/2008 | 4 |
| 5/14/2009 | Form 272 | 1/1/2009 | 3/31/2009 | 5 |
| 4/30/2008 | Form 269A | 1/1/2009 | 3/31/2009 | 6 |
| 4/30/2008 | Form 269A | 3/1/2009 | 3/31/2009 | 7 |
| 4/30/2009 | Form 269A | 2/1/2009 | 2/28/2009 | 8 |
| 4/30/2008 | Form 269A | 1/1/2009 | 1/31/2009 | 9 |
| 10/30/2009 | Form 269A | 7/1/2009 | 9/30/2009 | 10 |
| 1/29/2010 | Form 269A | 10/1/2009 | 12/31/2009 | 11 |
| 1/29/2010 | Form 425 | | 12/31/2009 | 14 |
| 4/28/2010 | Form 425 | | 3/31/2010 | 15 |
| 7/30/2010 | Form 425 | | 6/30/2010 | 16 |
| 10/29/2010 | Form 425 | | 9/30/2010 | 17 |
| 1/28/2011 | Form 425 | | 12/31/2010 | 18 |
| 4/29/2011 | Form 425 | | 3/31/2011 | 19 |
| 7/28/2011 | Form 425 | | 6/30/2011 | 20 |
| 10/31/2011 | Form 425 | | 9/30/2011 | 21 |
| 11/30/2012 | Form 425 | | 12/30/2011 | 22 |
| 5/2/2012 | Form 425 | | 3/31/2012 | 23 |
| 7/31/2012 | Form 425 | | 6/30/2012 | 24 |
| 10/30/2012 | Form 425 | | 9/30/2012 | 25 |
| 5/28/2014 | Form 425 | | 12/31/2013 | 26 |

112.    The Form 272 statements and claims included a certification that the report was "true in all respects and that all disbursements have been made for the purpose and conditions of the Grant or Agreement."

113.    The Form 269A statements and claims included a certification that the report was "correct and complete and that all outlays and obligations and unliquidated obligations are for the purposes set forth in the award documents."

114.    The Form 425 statements and claims included a certification that the report was "true, complete, and accurate…"

115.    The certifications were false and incomplete, and Defendants caused the statements to be made. They were incomplete for at least two reasons: (1) the report was not "true" in that Defendants failed to disclose money was improperly being paid to Valley Data as a kickback to Garza, Jr.; and (2) the disbursements were not made for the purpose of the Grant or Agreement – some of the disbursements were made to further the racketeering scheme to enrich Defendants.

116.    The certifications were also false in that they failed to accurately reflect how the money was spent.

117.    Defendant Godfrey Garza Jr. made, and the other Defendants caused to be made, the following statements:

| Date | Period Ending | Ex. LL Page |
|---|---|---|
| 7/29/2008 | 6/30/2008 | 1-15 |

| 10/28/2008 | 9/30/2008 | 16-29 |
|---|---|---|
| 1/30/2009 | 12/31/2008 | 31-43 |
| 4/30/2009 | 3/31/2009 | 44-46 |
| 7/29/2009 | 6/30/2009 | 47-49 |
| 10/30/2009 | 9/30/2009 | 50-52 |

118.     Ex. LL. Each of the above statements consisted of quarterly performance reports to DHS. The performance reports made detailed statements, claims, and other representations about how federal and local dollars were spent to further the cooperative project. Statements in the documents were false in that they failed to disclose that a conflict of interest existed, that Godfrey Garza, Jr. and Integ were being paid money for construction management (work he did not do and could not have done), and that VDCS was being paid money on the project as a kickback to Garza, Jr. and Integ. The claims were also false in the simple fact that the reports did not accurately detail how the money was spent.

119.     On or about September 11, 2008, the District asked DEC to disclose its subcontractors. Ex. EE. It never disclosed Valley Data, although it did disclose other subcontractors. This was another false statement.

**K.     The smokey back room**

120.     In furtherance of their conspiracies and illegal acts, Godfrey Garza, Jr., Louis H. Jones (DEC), Hugo Gonzalez (Dos Logistics), Eric Chin (Dos Logistics), Gumecindo Ybarra (Dos Logistics), Aron Reza (L&G), Daniel Rios (S&B), Sharlotte Teague (S&B), and other

engineering firm representatives met at Lansky & Brat in McAllen, Texas before the prime contracts that resulted in payments to VDCS were entered into by the District.

121.   At Lansky & Brat, Godfrey Garza, Jr. met with all firms in one room and then sometimes met one on one with individual representatives in a different part of the restaurant. During the joint sessions, Godfrey Garza, Jr. explained what projects were coming up and what work needed to be done. The individual sessions were to strike a deal on hiring VDCS and setting the stage for kickbacks in return for selection as a contractor. Before the Board ever voted on awarding a contract, Godfrey Garza, Jr. had already told the firms which projects they would be awarded. Participants referred to the Lansky meetings as part of "Godfrey's Game."

122.   The Lansky and Brats meetings happened on dates that include, but are not limited to, on or about: 05/04/2009; 07/18/2010; 07/23/2010; 02/02/2011; 02/03/2011; 01/04/2013; 04/24/2014; and 05/07/2014. Garza, Jr. improperly conducted District business at these meetings.

**L.   Godfrey Garza, Jr. hides his fraud**

123.   On or about June 3, 2014; April 16, 2013; December 31, 2011; December 31, 2013; and October 14, 2009, Godfrey Garza lied on questionnaires designed to detect fraud and conflicts of interest. Ex. W.

124.   Because of those lies, the District did not detect the fraud and/or the scope of the fraud for years.

125.    On or about January 15, 2013, Garza, Jr., see Ex. HH, represented to the District that:

- "The contract has a percentage for any projects that are constructed ... and that is whatever is built."

- "If nothing is built I collect nothing."

- "If we were to collect any percentage or fee it would be on whatever is built..."

126.    On or about January 22, 2013, Garza, Jr., see Ex. II, represented to the District that his 1.5% fee was for "whatever construction was done…"

127.    Plaintiff pleads that limitations and laches do not apply in this case because Godfrey Garza, Jr. has unclean hands, because he took affirmative steps to hide his misdeeds, and because under Texas law laches does not apply to governmental entities like the District.

128.    The District had an advisory board. Ex. JJ. The question of Garza, Jr.'s compensation came up at a meeting in or around 2012. *Id*. Garza, Jr. never mentioned he would be paid a percentage of construction costs. An advisory member spoke to Garza, Jr. after the meeting and told Garza, Jr. rumors were circulating Garza, Jr. would be paid over a million dollars to manage a District project. *Id*. Garza, Jr. said he did not know who would end up with the project management contract. Id. These statements were false and made in an effort to hide Garza, Jr.'s wrongdoing.

M.    **Certificates of merit**

129.    Plaintiff does not believe the Texas certificate of merit statute applies to this action.

130.    In an abundance of caution, a certificates of merit is attached as Exhibits X.

# IV.   Causes of action

A.    **Count 1: violation of the Racketeer Influenced Corrupt Organizations Act (all Defendants)**

131.    Plaintiff incorporates paragraphs 1-130 by reference and adopts those paragraphs as if fully restated herein.

132.    Plaintiff acknowledges that many of the facts at issue in this Complaint were also at issue in earlier state court litigation.  However, where there is a similarity of parties, the state court dismissed the claims asserted in this Complaint *without* prejudice to refiling.  Ex. VV.

133.    Integ, Godfrey Garza, Jr., VDCS, Annie Q. Garza, Godfrey Garza, III, DEC, TEDSI and Dos Logistics violated 18 U.S.C. § 1962(c) by being associated with and participating in the conduct of an association in fact engaged in or affecting interstate commerce through a pattern of racketeering activity.

134.    Under 18 U.S.C. § 1962(c) a plaintiff must prove: (1) a person engaged in (2) a pattern of racketeering activity connected to (3) the conduct or control of an enterprise.

135.    **Person**: Defendants are "persons" under 18 U.S.C. 1961(3). Each Defendant is an "individual or entity capable of holding a legal or beneficiary interest in property."

136.    **Racketeering Activity**: A "racketeering activity" as defined by 18 U.S.C. § 1961(1) includes, *inter alia*, any act or threat involving bribery which is chargeable under State law and punishable with imprisonment for more than one year and any act which is indictable under 18 U.S.C. § 201, 18 U.S.C. §1341, 18 U.S.C. § 1343, 18 U.S.C. § 1513(b); 18 U.S.C. § 1952; and 18 USC § 1957.

**A.1     Pattern of racketeering activity**

137.    **Texas Penal Code § 36.02 (state law bribery)**

137.01    Integ, Garza, Jr. (for himself and Integ), DEC, TEDSI and Dos Logistics committed the "racketeering activity" of bribery under Section 36.02 of the Texas Penal Code and the crime is punishable with imprisonment for more than one year. DEC, TEDSI and Dos Logistics intentionally or knowingly offered, conferred, or agreed to confer on Integ and Garza, Jr. a benefit in the form of money and property for the consideration of Integ and Garza, Jr.'s decision, opinion, recommendation, vote or other exercise of discretion as public servants. Integ and Garza, Jr. were public servants or public officials per their roles as General Managers of the District.  Integ and Garza, Jr. solicited, accepted, or agreed to accept the benefits offered by DEC, TEDSI and Dos Logistics.

137.02    Additionally, DEC, TEDSI and Dos Logistics intentionally or knowingly offered, conferred, or agreed to confer on Integ and Garza, Jr. a benefit (in the form of money routed through VDCS) because the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to grant DEC, TEDSI and Dos

Logistics contractor status and the Contractor Defendants would not have been granted such status or contracts but for the benefit.

137.03    To further the bribery scheme, TEDSI (through one of its principals, Mark Lupher) represented to the Board at a public meeting that it was in the District's best interests to hire Integ as a construction manager, even though TEDSI later contracted to perform those services itself.

138.    **18 U.S.C. § 201 (bribery):** DEC, TEDSI and Dos Logistics (by hiring VDCS, by paying VDCS an inflated price, by paying VDCS for services it was not qualified to render, and by paying VDCS for services it did not provide) directly or indirectly gave money and property to Garza, Jr. and Integ with the intent to influence Garza, Jr.'s and Integ's official acts in recommending or approving DEC's, TEDSI's and Dos Logistic's contractor status. Furthermore, Garza, Jr. and Integ accepted such payments with the requisite intent, and VDCS routed the payments with the requisite intent. The Contractor Defendants made these transfers of money and property with the requisite intent.

138.01    Godfrey Garza, Jr. and Integ are "public officials" as contemplated by 18 U.S.C. 201.  A person that occupies a position of public trust with official federal funds or responsibilities is considered a "public official" for purposes of 18 U.S.C. § 201. Godfrey Garza, Jr. and Integ held positions of public trust with official federal funds or responsibilities in the sense that Godfrey Garza, Jr. and Integ were responsible for overseeing the spending of federal funds awarded to the District.

138.02    Integ and Godfrey Garza, Jr., as the District's General Manager, were charged with advising the Board of Directors to make decisions regarding drainage programs and projects for the District's taxpayers. While the Board makes final decisions regarding District priorities, policies, personnel, expenditures, and growth management, Integ and Godfrey Garza, Jr. were trusted to give the Board sound advice uncluttered by graft and conflicts of interest. Thus, Godfrey Garza, Jr. and Integ held positions of public trust.

138.03    Additionally, Godfrey Garza, Jr.'s position as General Manager included the management of federal funds or responsibilities. The District's budget with respect to the federal project was funded primarily from two sources: local funding (bond proceeds and local taxes) and federal funding. Federal funds were provided to the District specifically for the federal project through DHS Award Number DHS-CBP-08-112-001. This was an award paid in part via the federal American Recovery and Reinvestment Act. At all relevant times, it was Godfrey Garza, Jr.'s responsibility to supervise the expenditure of these federal funds. Specifically, Godfrey Garza, Jr. and Integ were charged with overseeing DHS money on levee improvements that would support a border fence. Accordingly, Integ and Godfrey Garza, Jr. qualify as public officials under 18 U.S.C. 201 because as part of their responsibilities they recommended how federal funds provided to the District were allocated and spent, and because they oversaw the spending and allocation.

139.   **18 U.S.C. § 1341 (mail fraud)**: Integ, Godfrey Garza, Jr., VDCS, DEC, TEDSI, Dos Logistics, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza devised a scheme or artifice to defraud by means of transferring payments and other things through the U.S. Mail. Defendants all caused payments to be made through the mail. The District made payments through the mail to DEC, TEDSI, Dos Logistics and Integ based on fraudulent invoices delivered by those Defendants. The Integ invoices were fraudulent because, among other things, they billed for work Integ and Godfrey Garza, Jr. did not do; they billed for construction management when DEC and other contractors were actually doing construction management; and for the other reasons set out in Part IV.

139.01   DEC, TEDSI and Dos Logistics made payments through the mail based on fraudulent invoices that were sent or caused to be sent by VDCS, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza. The VDCS invoices were fraudulent because they were in reality (at least partly) bills for bribes and kickbacks.  DEC, TEDSI and Dos Logistics knew the mailed payments were for bribes and kickbacks.

139.02   Integ and Godfrey Garza, Jr.'s mail fraud included acceptance of payments from the District that but for his fraud would not have been mailed. The scheme to defraud was with the intent to deprive another of the intangible right of honest services of Integ and Godfrey Garza, Jr.

139.03   VDCS, Godfrey Garza, III, Annie Q. Garza, and Jonathan Garza's mail fraud included acceptance of payments from DEC, TEDSI and Dos Logistics through the mail that but for Defendants' fraud and bribery would not have been mailed. The

payments constituted bribes and kickbacks to Integ and Godfrey Garza, Jr. The scheme to defraud was with the intent to deprive another of the intangible right of honest services of Integ and Godfrey Garza, Jr.

140.    **18 U.S.C. § 1343 (wire fraud)**: Integ, Godfrey Garza, Jr., VDCS, DEC, Dos Logistics, TEDSI, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza devised a scheme or artifice to defraud by means of wire, radio, or television communication in interstate commerce. Integ and Godfrey Garza, Jr. caused to be made payments by the District that were based on fraudulent invoices. The payments were made by check. Funds were then transferred between financial institutions or within financial institution by means of wire communications. Payments from DEC, TEDSI and Dos Logistics to VDCS were then turned over to Integ and Godfrey Garza, Jr. as bribes and kickbacks. Integ, VDCS, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza all accepted illicit payments.

140.01    Payments from the Contractor Defendants to VDCS were made by check. Funds were then transferred between or within financial institutions by means of wire communications. DEC, VDCS, TEDSI, Dos Logistics, Annie Q. Garza, Jonathan Garza, and Godfrey Garza, III made the payments, and Godfrey Garza, Jr. and Integ accepted the payments, as part of an intentional scheme to get a public contract or get a public contract on more favorable terms than would be likely to be received otherwise therefore constituting a scheme to defraud the public. The wire fraud included acceptance and transmission of payments that but for bribery would not have been

made. This scheme to defraud was with the intent to deprive another of the intangible right of honest services of Godfrey Garza, Jr. and Integ.

141.    **18 U.S.C. § 1952 (use of interstate mail to aid in racketeering activity)**: Integ, DEC, VDCS, TEDSI, Dos Logistics, Godfrey Garza, Jr., Annie Q. Garza, Godfrey Garza, III and Jonathan Garza used the mail or a facility in interstate commerce with the intent to distribute the proceeds of bribery or otherwise promoted, managed, established, carried on, or facilitated the promotion, management, establishment, carrying on, of bribery and theft of honest services.

142.    **18 U.S.C. § 1956 (money laundering)**: VDCS, DEC, TEDSI, Dos Logistics, Integ, Annie Q. Garza, Godfrey Garza, III, Godfrey Garza, Jr., and Jonathan Garza, with the intent to promote unlawful activity, knowingly engaged in monetary transactions in criminally derived property. The criminally derived property was the payments VDCS, Annie Q. Garza, Godfrey Garza, III, and Jonathan Garza received from DEC, TEDSI and Dos Logistics. Such payments were bribes. When VDCS, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza transferred portions of the payments to Integ and Godfrey Garza, Jr., such transfers amounted to money laundering. This scheme had the purpose and effect of concealing the source of money obtained by illicit means, namely bribery and theft of honest services

143.    **18 U.S.C. § 1957 (monetary transactions derived from unlawful activity)**: VDCS, DEC, TEDSI, Dos Logistics, Integ, Annie Q. Garza, Godfrey Garza, III, Godfrey Garza, Jr., and Jonathan Garza knowingly engaged in monetary transactions in criminally derived property (bribery) of a value greater than $10,000 in the United States.

144.   **18 U.S.C. 1951 (Hobbs Act extortion)**: Integ and Godfrey Garza, Jr. acted under color of official light in committing the acts identified in Parts III and IV. VDCS, DEC, TEDSI, Dos Logistics, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza conspired with Integ and Godfrey Garza, Jr. to achieve their illegal purpose, bribery.

145.   The Defendants are engaged in interstate acts of commerce and the acts alleged herein have a potential effect on commerce.

**A.2   Association in Fact 1**

146.   VDCS, Integ, DEC, Dos Logistics, TEDSI, Annie Q. Garza, Godfrey Garza, III, Godfrey Garza, Jr. and Jonathan Garza formed an association in fact.  They associated with and participated in the ongoing organization and functioned as a continuing unit.  The individuals (and entities run by the individuals) associated together to commit several criminal acts as set forth herein which gave their association an ongoing nature, bringing it within the RICO Act's purview.

147.   The members of Association in Fact 1 formed for a common purpose of economic gain and to commit bribery. These persons associated together to commit numerous acts constituting bribery over many years.

147.01   The VDCS Defendants (VDCS, Annie Q. Garza, Jonathan Garza, and Godfrey Garza, III) participated in the conduct of Association in Fact 1 as set out in Section III.  By example, the VDCS Defendants contracted with the Contractor Defendants to perform services VDCS could not perform in order to cover up bribe

payments as legitimately invoiced work.  The VDCS Defendants also routed money back to Integ and Garza, Jr. through sham loan and rent payments.

147.02    The Contractor Defendants participated in the conduct of Association in Fact 1 as set out in Section III.  By example, the Contractor Defendants improperly hired VDCS, covered up the hiring, bribed Integ and Garza, Jr., and inflated pricing to augment their earnings and Garza, Jr.'s/Integ's "commission."

147.03    Integ and Garza, Jr. participated in the conduct of Association in Fact 1 as set out in Section III.  By example, Garza, Jr. and Integ recommended hiring of the Contractor Defendants, concealed the use of the VDCS Defendants as a kickback vehicle, and concealed the hiring of VDCS by the Contractor Defendants.

147.04    The specific acts of bribery include: (1) VDCS, Godfrey Garza, III, Annie Q. Garza, and Jonathan Garza received payments of the invoices identified in the "Facts" section of this Complaint from DEC, TEDSI and Dos Logistics without those Defendants receiving something of reasonably equal value (that is, VDCS inflated its billing and the Contractor Defendants knowingly paid the inflated billing to bribe Integ and Godfrey Garza, Jr.; (2) VDCS, Annie Q. Garza, Godfrey Garza, III and Jonathan Garza then transferred some of that money to Integ and Godfrey Garza, Jr.

148.    As more fully set out in Section III, Association in Fact 1's unlawful activity started in or around 2007 and continued through January 31, 2018.

149.    There thus is a continuity of racketeering activity that can be established by pointing to a closed period of repeated conduct.

150.    In the alternative, the activity (Integ attempting to collect on fraudulent invoices) continues to the present as Integ continues to litigate its supposed right to payment.

151.    As a direct and proximate result of the Defendants' violations of 18 U.S.C. §§ 1962(c) Plaintiff suffered injury to its ordinary commercial interests. That is, it paid money to DEC, TEDSI, Dos Logistics, and others that those persons and entities used to bribe Garza, Jr. and Integ. Plaintiff was deprived of its tangible right to honest services from Godfrey Garza, Jr. and Integ. Plaintiff paid above market value on the projects identified in Section III because Integ and Godfrey Garza, Jr. knew they would get a piece of the amounts paid to the Contractor Defendants.

152.    The injuries suffered by Plaintiff were reasonably foreseeable or anticipated by Defendants as the natural consequence of their acts.

153.    Plaintiff seeks treble damages. 18 U.S.C. § 1964(c).

**B.      Count 2: veil piercing (Integ, VDCS, DEC, Dos Logistics and TEDSI)**

154.    The corporate forms of Integ Corporation, Valley Data Collection Specialists, Inc., Dannenbaum Engineering - McAllen, LLC, Dannenbaum Engineering, Dos Logistics and TEDSI should be disregarded because:

154.01    The forms were used as shams to perpetrate a fraud;

154.02    Integ was organized and operated as the alter ego of Garza, Jr.;

154.03    Valley Data Collection Specialists, Inc. was organized and operated as the alter ego of Gara, III, Jonathan Garza, and Annie Garza;

154.04    The Dannenbaum entities were organized and operated as the alter ego of Louis Jones;

154.05    The forms of these companies were used to circumvent Texas and federal procurement statutes;

154.06    Garza, Jr. caused Integ to be used for the purpose of perpetrating an actual fraud and did perpetrate an actual fraud in Plaintiff for Defendant's direct personal benefit;

154.07    Louis Jones caused the Dannenbaum entities to be used for the purpose of perpetrating an actual fraud and did perpetrate an actual fraud in Plaintiff for Jones' direct personal benefit; and

154.08    Godfrey Garza, III, Jonathan Garza, and Annie Garza caused Valley Data Collection Specialists, Inc. to be used for the purpose of perpetrating an actual fraud and did perpetrate an actual fraud in Plaintiff for these Defendants' direct personal benefit.

**C.    Count 3: fraud (DEC, Dos Logistics and TEDSI)**

155.    DEC, Dos Logistics and TEDSI committed fraud by making false representations to cause the District to pay them millions of dollars. The Contractor Defendants falsely represented that funds were due to them which were not actually due, and falsely represented that invoices were only for work they and approved subcontractors performed, when in truth a portion of the payments were designated for kickbacks disguised as subcontractor payments

to Valley Data Collection Specialists, Inc. The District relied on these fraudulent representations and nondisclosures when making payments. As a result of this fraud, the District made millions of dollars in improper payments.

**D.      Count 4: breach of contract (DEC, Dos Logistics and TEDSI)**

156.    The Contractor Defendants breached their contracts with the District by:

156.01    Subcontracting with VDCS without the District's prior written consent;

156.02    Failing to the hiring of  VDCS and that the hiring constituted a conflict of interest; and

156.03    Failing to file conflict of interest statements and/or affidavits.

157.    The District sues to recover the millions of dollars in damages caused by these breaches of contact, as well as its attorneys' fees.

**E.      Count 5: civil conspiracy (DEC, Dos Logistics and TEDSI)**

158.    The Contractor Defendants conspired to defraud Plaintiff. This civil conspiracy involved the Contractor Defendants routing kickbacks as subcontractor payments to Valley Data Collection Specialists, Inc., which then distributed all or some of those funds to Godfrey Garza, Jr., and Integ. The unlawful, overt acts included failure to disclose conflicts of interest, presentment of SA's and WA's that resulted in payments to VDCS, representing to the District that payments were for work performed by the Contractor Defendants when millions of dollars were actually going to be routed as kickbacks through the subcontractor scheme, and in

submitting invoices. This civil conspiracy proximately caused millions of dollars in damages to the District.

**F.      Count 6: unjust enrichment (DEC, Dos Logistics and TEDSI)**

159.    It would be unconscionable for the Contractor Defendants to retain the benefits obtained through their illegal and unethical schemes (including the payments related to the federal project and the kickbacks made through Valley Data Collection Specialists). The District seeks to recover the millions of dollars in unjust enrichment paid, directly or indirectly, to Defendants.

**G.      Count 7: constructive trust (DEC, Dos Logistics and TEDSI)**

160.    The Contractor Defendants hold all of the assets and funds obtained through their schemes, frauds, and conspiracies in constructive trust for the benefit of the District. The District seeks title to the assets and funds held in constructive trust.

# V.    Damages

161.    Plaintiff seeks to recover compensatory damages from Defendants. These damages include Defendants' assets obtained through the scheme, the funds improperly paid to Integ Corporation for services not actually performed, pre-award costs not recovered from the federal government, funds paid to Integ Corporation related to the federal project, and funds paid to Valley Data Collection Specialists as kickbacks/improper subcontractor payments. Defendants acted with fraud, malice, and gross negligence. Therefore, Plaintiff also

seeks an assessment of exemplary damages against each Defendant. Plaintiff also seeks to recover prejudgment interest, postjudgment interest, court costs, and attorneys' fees.

162.    Plaintiff's damages exceed the Court's jurisdictional minimum.

## VI.    Jury demand

163.    Plaintiff demands a jury trial.

## VII.    Conclusion & prayer

164.    Plaintiff asks the Court to enter judgment against Defendants, jointly and severally, for compensatory damages, against each Defendant for exemplary damages, and against Defendants, jointly and severally, for attorneys' fees, prejudgment interest, postjudgment interest, and court costs.

Respectfully Submitted,

/s Michael J. Blanchard
Federal ID 34400
Texas Bar No. 24036231

OF COUNSEL:

Butcher & Blanchard, LLP
2929 Mossrock, STE 222
San Antonio, TX 78230
Phone: (210) 957-7001
Fax: (210) 957-7011
Email: mike@texasjustice.law

-and-

/s Shelly A. Sanford
Texas Bar No. 00784904

OF COUNSEL:

Watts Guerra LLP

811 Barton Springs Rd., STE 725
Austin, TX 78704
Phone: (512) 479-0500
Email: ssanford@wattsguerra.com